11314 CFPB v. Ocwen. We have Mr. DeMille Wagman here for the appellant and Mr. Jay for the appellee. Mr. DeMille Wagman, have I pronounced that correctly? You got it exactly right, Your Honor. Very well. So you may proceed when ready. May it please the Court. Again, Lawrence DeMille Wagman for the Consumer Financial Protection Bureau. The District Court in this case got it wrong when it dismissed the Bureau's complaint. It did so based on its misassessment of the preclusive effect of a consent judgment that the Bureau, along with 49 states and the District of Columbia, entered into with Ocwen in 2013. That consent resolved charges stemming from mortgage foreclosures that Ocwen and Ocwen engaged in in connection with the 2008 mortgage crisis. Now as part of that consent, the Bureau and Ocwen agreed to a release, and it is hard to imagine how that release could have been more specific. So can I ask you a question about the release? Because I certainly understand that you focus on the release, they focus on the compliance standards and the enforcement mechanism. But as to the release, it seems to me as I read the settlement agreement that it basically sets up sort of three eras, if you will. There's like the pre-2014 era, those claims released, gone, free and clear. And then the post-2017 era where it seems like all is fair in love and war. And then this intermediate period where it seems like that the parties agreed to a kind of specific enforcement mechanism that shouldn't, it seems, be interpreted sort of by allowing you to do what you could do post-2017. No, Your Honor, we don't interpret that out of existence at all. Now the release did say, it's paragraph E of the release, and that's quoted in the district court's decision at page seven of the slip opinion. It says that nothing in the release limits the Bureau's authority with respect to Ocwen except as to the claims that are specifically released. Now as to, and the district court really focused on, as you said, Your Honor, the enforcement mechanism. The enforcement mechanism, it's important to look at what the enforcement mechanism actually says. The enforcement mechanism is quoted, I believe, in full at page nine of the district court's slip opinion. In Ocwen's brief at page 24, it describes the enforcement mechanism as applying to activities controlled by the servicing standards. Now remember, the servicing standards were injunctive provisions included in the consent. They were essentially fencing in relief that stayed in effect for three years, and they were designed to prevent Ocwen from venturing too close to the sorts of violations that were alleged in the past. The enforcement mechanism, by its terms, applies only to Ocwen's obligations under the consent. Its obligations under the consent, not to activities controlled by the servicing standards. But isn't there, and you can tell me if I'm wrong, but isn't there substantial overlap between the sorts of alleged wrongs that would be subject to this enforcement mechanism and the sources of alleged wrongs that you say can be tried under different statutes, regulations, theories, whatever? Your Honor, the servicing standards are sort of like a moat or something around the law violations. And it is true that in many instances, depending on the specific situations, because there are some servicing standards that don't even apply to some of the counts in the Bureau's complaint, and I can get into that. But if Ocwen violates the law, it may well have to be a moat. This situation, Your Honor, is very similar to the situation that frequently happens with regulatory agencies. Regulatory agencies enter into consents with regulated parties. Those consents often include injunctive relief going forward. Now, if the regulated entity violates the law going forward, it may well also violate the injunctive provisions. The regulatory agency has the option of bringing a contempt action for the violations of the injunctive provisions, but the regulatory agency is also free to bring a new action, as the Bureau did here, challenging the violations of the law as part of that new action. So what exactly then did Ocwen buy in this interim period? Like in the settlement, you know, to sort of dot the I's and cross the T's in accordance with these compliance standards and the enforcement mechanism, like what did they get out of that? And like why would any party in the future enter into this kind of consent agreement? Your Honor, of course, when you look at a consent, you look at the four corners of the consent. You don't try and divine the party's purpose. That's the Armour v. United States case, which we cite in our reply brief. But here's what Ocwen got. This consent was brought by the Bureau, 49 states, and the District of Columbia. If Ocwen committed a contempt by violating one of the servicing standards, it was potentially, it could potentially face 51 separate contempt actions. The enforcement mechanism provides a means of regulating that process so all enforcement actions for violations of the servicing standards are filtered through the monitoring committee. It allowed the monitoring committee, first shot, to bring those contempt actions. And I assume, that's what, I presume again, that's what Ocwen was bargaining for. It was preventing itself from facing 49, 51 potential contempt actions. Going back to your concern that there are matters that were not addressed in the agreement, didn't it provide a method by which you could expand it that the parties could address new regulations or new issues that arose without the necessity of going back to litigation? No. Why wouldn't you use that? Wasn't that available to you? No, it did not, your honor. It provided for, and I think the district court judge discusses this to some extent, it provided for certain situations in which the district court judge could seek new metrics. A metric was the means by which the monitor, who was to assess compliance with the servicing standards, this was how the monitor measured compliance with those servicing standards. But for example, count 7 in the Bureau's complaint alleges that Ocwen violated the Real Estate Settlement Procedures Act, RESPA, and RESPA's implementing regulations by failing to conduct annual escrow analyses for borrowers who had escrow accounts and failing to provide them with annual escrow statements. There is no servicing standard that even remotely applies to Ocwen's failure to conduct these escrow analyses. In its brief at page 13, Ocwen lists three servicing standards that it contends applies to this obligation to Ocwen. They list servicing standard 1B1, 1B5, 7A1. 1B1 requires Ocwen to timely post-borrowers payments. 1B5 applies to Ocwen's obligation to provide accurate and timely billing statements. And 7A1 requires Ocwen to, prohibits Ocwen from charging borrowers for so-called forced place insurance when they don't need it. There's no servicing standard. The servicing standards, there's no servicing standards that apply to Ocwen's obligation to conduct these escrow accounts and there is nothing other than going back to the court and trying to renegotiate the consent that would have allowed the Bureau to have a new servicing standard that applied to this obligation. But again, the servicing standards are fencing in relief. That is separate from Ocwen's obligation to comply with the law. Can I ask you a quick question? This may be the most remedial, dumbest question you've ever heard. But I mean, so even though I think there seems to be like raging agreement here that we are sort of in Norfolk Southern land in the sense that we're looking at the consent decree. Fundamentally, we are still doing sort of res judicata analysis here just by reference to something else. Instead of the complaint, we're looking at the consent decree. So I mean, if res judicata is, it applies not only to claims that were brought, but to those that could have been brought. It just, if the CFPB wanted to be able to be sort of like free and clear to bring what I'll call independent enforcement actions for this interim period, 2014 to 2017, why didn't it just negotiate a different kind of consent decree or a Norfolk Southern-type consent decree that's like a toggle? You're either released or you're on the hook. Instead, like what's this? I don't understand what this middle period is sort of for. Your Honor, this middle period, it provides Ocwen with these servicing standards so it can begin to bring its conduct into compliance with the law. But I guess what I'm asking is, if what you wanted was a way to bring Ocwen's conduct into compliance with the law, why not just release pre-2014 and start just enforcing to the hilt post-2014? Your Honor, I guess the question could be asked sort of the other way. If Ocwen had wanted to be free from law violations post-December of 2013, why didn't it negotiate for a release that gave it that freedom? Norfolk Southern is a good case to look at because in Norfolk there was a litigation for pollution, for leakage from an oil tank. And there was a release for past, present, and future cases involving harm caused by oil that leaked from the oil tank. Later on, the oil company gets sued for the sludge leaking from the oil tank. Oil tanks that have been used for a period of time, they accumulate sludge at the bottom of the tank. Not surprisingly, the tank has a leak, oil leaks out of the tank, sludge leaks out of the tank. The district court held, well, of course, yes, there's a release there that applies specifically to oil. But of course, everybody should have contemplated that sludge is going to leak from this oil tank as well. And this court held no. You look to the specific intent of the parties as expressed in the consent. Here, the intent is quite specific. Claims prior to December of 2013 released. After that, the Bureau specifically included or specifically included in the release, the Bureau's authority with respect to Ocwen is not limited except as to the claims that have been specifically released. That's paragraph E of the release. That's quite specific. Yes, there is this mechanism for Ocwen to follow going forward. But again, this is frequently the case in consents that regulatory agencies enter into with regulated parties. If the regulated party in the post-consent period violates the law in a way that also violates the injunctive provisions of the consent, the regulatory agency is free to either pursue a contempt action or to bring a new law enforcement a new case alleging the law enforcement violations. It may be now that Ocwen wishes it had negotiated a more thorough, more comprehensive release in 2013, but it did not. Counselor, let me follow up on a question that Judge Newsom asked you earlier. I was curious about, Judge Newsom asked you, what did Ocwen get out of the deal? What's their consideration here? And I heard you to answer to say all enforcement actions were filtered through this monitoring committee. You recall that dialogue? Yes, Your Honor. If that's what I said, I misspoke. Okay. You tell me then, as you see it, what did they get out of the deal? Your Honor, that may be a question that's better addressed to Ocwen's counsel, but Ocwen was facing actions by 49 states, the District of Columbia, and the Bureau. It ended all of those actions in one swell foop here, and that may be what it bargained for here. And it bargained for a mechanism that controlled contempt actions going forward. It would not face 51 contempt actions because they had to be filtered through this monitoring committee. But again, you could ask Ocwen what they bargained for. What does any party bargain for when it enters into the- Was their liability, was their exposure limited by this deal? They still had an obligation to comply with the law. It limited their liability with respect to conduct that had occurred prior to December 18th of 2013. Afterwards, the consent specifically says, nothing in this consent releases Ocwen from its obligations to comply with the law going forward. It violated the law going forward. Yes, the Bureau could have brought a contempt action, which would have covered some of the conduct that the Bureau charged in its complaint. But the Bureau would also then have had to have brought a separate action to challenge Ocwen's conduct that did not comply with- that was not covered by the consent. And I dare say we would have heard a lot of complaints from Ocwen if the Bureau had brought a contempt action in the District of Columbia and a separate action here in the Southern District of Florida so that the Bureau could have challenged all of Ocwen's conduct. The Bureau brought one complaint in Southern District of Florida challenging all of Ocwen's violations. Thank you. Okay, very well. Thank you so much. Mr. Jay, let's hear from you. That doesn't look good. Yeah, sorry. I'm a little gimpy today. Pardon me if I lean on this chair a little bit. Good morning, Your Honors. William Jay representing Ocwen. I am going to take this mask off. The way that Ocwen got out of the deal was not just the release, but the second period that you, Judge Newsom, alluded to, the period when all enforcement would be channeled through the D.C. District Court. Now, there's great specificity in the standards and the metrics. So for example, there's a phase-in period. There are standards that say what Ocwen must do. And then there are metrics that determine whether Ocwen is in violation. Then there's a right to cure, which is a really important part of the deal. So what my friend on the other side said was that all Ocwen got was the ability to have contempt actions brought in D.C. But recall that the Bureau's position is that at the same time, even during the phase-in period, for example, they couldn't bring the contempt action because the standards are still phasing in. But their position is that even when there's an on-point standard, even when there's an on-point metric and there's no violation of the decree, on that first day after the settlement, they could bring an action in the Southern District of Florida alleging violations and even violations that don't constitute violations under the standards. As the Bureau says in its reply brief, I think this is at page 27, there's no tolerance for because the parties agreed that what was important was to bring Ocwen's systems and practices into compliance, that they would have time to do so, and that there would be a system of measurements that established whether they had done so. If they complied with the standards or if they fixed any violation timely, exercising the bargain for right to cure, then there would be no penalty. If they didn't, then the penalty is swift and sure. There's no need to adjudicate things like willfulness or knowledge. It's a $1 million penalty at the drop of a hat. That was the bargain. That's what the Bureau is attempting to unwind here because the colloquy about the escrow, I certainly disagree with my friend's contention that there is no standard on-point, but even if you agreed with everything that he said about that point, recall that his position is that even when there is an on-point standard, even when there's an on-point metric, and even when there's no violation or a potential violation has been cured, the Bureau still gets to impose civil penalties for every, in its view, violation of the law, even though it doesn't violate the standards or the metrics. So what about his position looking at paragraph E of the release that says it doesn't say anything, or it doesn't limit the Bureau's enforcement power with respect to claims not released, and then, I guess, sort of piggybacking on that, are you asking us to sort of imply a term in the agreement that the servicing standards slash enforcement mechanism for those interim three years would be the exclusive enforcement mechanism? I mean, like, what's going to keep them from bringing sort of lawsuits that they could otherwise bring, I guess, is what I'm asking. Right. So let me answer those in turn. So on paragraph E, so it says nothing in the release shall limit the CFPB's authority, and our contention is not that they've released this liability, and indeed, that really is our point, that during the second period of the three periods that you laid out, Judge Newsom, if the parties had written the release to cover that period, then how would the Bureau go into district court and seek the $1 million penalty for a violation? The release would cover it. That's why the release looks backward, and the other provisions look forward. Now, there is a sense, yes, in which we are saying that the provisions are exclusive, and there is no one provision that says these enforcement mechanisms are exclusive of all others, but I think that that's the necessary implication, especially once you look at the substance of the standards and metrics themselves. Take, for example, the Truth in Lending Act count, which says that there shall be a monthly statement, and sometimes the amounts due were incorrect, or other things that are required were incorrect. Now, that regulation may not have taken effect at the time the decree was filed with the court, but the standards anticipated that, because the regulation had already been finalized, implementing a statute that had been adapted in 2010, and you'll see that the standards have basically the same things, that a monthly statement must include the amount due, it must include how the payments are being applied, whether a payment has gone into a suspense account. Basically, it looks an awful lot like the regulation, and then there are metrics, metric 33 in particular, which says how the monitor is going to establish whether OCWIN has been complying with that obligation to have the correct information on statements. Now, our friends on the other side say, well, that metric isn't good enough. This is the last part of their reply brief, which I think really kind of underscores the problem that we have with their argument, that those metrics aren't good enough because, for example, they're based on the system of record. There's another standard that deals with how to verify whether the system of record is adequate. The Bureau says, well, that standard wasn't good enough because it dealt with an independent authority, but not the monitor himself. Again, these are disagreements with the substance of the party's deal, and to your point, Judge Story, it's correct that the decree only provides for the monitor to add metrics and not standards, but I think that the decree itself says that if the parties want to modify the decree, they come back to the district court in D.C. and they'd have to meet the standards of Rule 60B, but that would be a motion that a party can make as with any decree during its lifetime. But the Bureau's position is that even, for example, during the phase-in period, which they object to in a footnote in their reply brief, even during that phase-in period, they can bring an action in any district court in the country. They never have to go back to D.C., and it does not matter that the standards and metrics are not being violated or that it's baked right into those standards. And I think that the right-to-cure point really is kind of the best rejoinder to your question. It's not a rejoinder to your question, but the best response to your question, Judge Newsom. What in this decree is most inconsistent with the idea that the Bureau could, the next day, bring a new action for civil penalties in any district in the country? I think it really is the right-to-cure because it gives a certain amount of time. It provides that ACWA has to kind of keep its nose clean for the violation. The defined term is potential violation. And if it does that, then it's not subject to penalties. And I think that while it doesn't say, and this shall be the exclusive procedure under the law of judgments, I think that the law of judgments does that work for you. That when the parties have pre-baked relief for a claim brought in court and embodied that relief in a judgment, that that is the, under the doctrine of merger, the merger branch of res judicata, that's all the relief that the party bringing that case can obtain. Can I ask you a question, I guess, about what you would be asking us to do? You've got this chart in your red brief, sort of this claim by claim analysis. If we were to conclude that you're right with respect to this interim period, should we be doing that claim by claim analysis ourselves? Or do you think it's better for the district court to do that in the first instance? Well, I think that if you conclude that we're right, our position is that even if there is not a standard that embodies every aspect of whatever regulation the Bureau is now trying to, to bargain for, is now trying to enforce, I mean, that's part of the bargain for deal, that there, if there isn't a standard on point or more relevantly, if ACWIN passed the metrics under that standard, but the Bureau says that it's still in violation, I don't think that you should go through and compare the standards to their allegations and say, well, we don't find a standard that's sufficiently close to this allegation and so we're going to remand on it. But if you wanted, so, because of course the Bureau's position is even if there's an on point standard, we win. If the, as I understand your question, it was getting at what should the court do if you think that it matters whether there's an on point standard or not? Yeah. So, I think that if that's what you decided, you, it would make sense to remand to apply that and have the district court look at which standards map on. To be clear, our position is that you shouldn't do that because we think that each allegation has a sufficiently on point standard and I'd like to respond to the escrow point if I, if I can, in a, in a moment. But just to be clear, our position is that you don't need a remand because the standards are exclusive and even if I can't persuade you that there's one, one or three or five standards that map onto the escrow point, that shouldn't deter you from remanding, from affirming. But I don't think that you need to, if you disagree with me on that conceptual point, I don't think you need to parse through each standard yourselves. We could do that before the district court. Okay. But, so, let me respond on the escrow point because that really is the only example the Bureau has given in its briefing, its reply brief here today about something that it thinks does not sufficiently map onto, onto the allegations. So, let me just note first that it is, the Bureau spent an enormous amount of time in the district court alleging that the reason they were pursuing this escrow analysis violation and one of the categories of damages that they wanted to seek was that failure to perform this escrow analysis led to foreclosures. There's a pending Daubert, there was at the time the case was dismissed, a pending Daubert motion on exactly that issue. So, it is, it is surprising to hear the Bureau try to distinguish the escrow point that it is now arguing has nothing to do with the prior action and that the prior action is all about foreclosures when it's, part of its theory is that the failure to perform escrow analysis leads to foreclosures and that's part of the category of damages that it's seeking. But more fundamentally, there are several standards that, that are relevant here because when, an escrow analysis is about how much you pay, how much you pay each month into your escrow account and it's supposed to be recomputed each year so that if the, if next year's insurance and tax payments will be less, then you don't have to pay as much or if your escrow balance has gotten a little higher, then there's more, and there's more of a cushion, then your payments can be lower. The standards, including 1B1 and 1B5, get into the monthly statement and its need to be accurate. So, including how much do you owe and then how is the payment going to be applied. And one of the things that has to be on the statement in 1B5 is specifically your escrow balance. So, so that's covered by the, by the standards. And the, more generally, 1B8 and 9 affect OCWIN's obligation to, to ensure that correct information is used in all of the consumer's account, all of the deal, all dealings with the consumer's account. So, we think that that adequately covers the point and certainly enough that if the Bureau thought this was a real concern, the escrow analysis specifically, that is the kind of thing where it could have sought to add a metric because it's covered, it's sufficiently covered by the standards to add a metric. We don't think that you need to go beyond that, but we also pointed to other provisions dealing with the use of escrow, for example, to buy insurance when the escrow account doesn't, when the insurance policy purchased with the escrow account has lapsed and there are provisions saying that the, that OCWIN has to let its own insurance policy go if there's enough money in the borrower's escrow to, to buy a borrower paid insurance policy. All of these things deal with this, the same subject matter that the escrow analysis is, is getting to. I candidly say to the Court that there isn't a thing in the standards that says every year within 30 days or the end of the year, you must perform an escrow analysis. But the harms that the Bureau says it's trying to remediate in this action are certainly addressed. And then more to the, if someone gets into foreclosure, there's a whole set of standards and a whole set of metrics that deal with the obligation to have sufficient information in the single point of contact, the one person at OCWIN who's supposed to deal with the person who's a candidate for foreclosure, to know all their loss mitigation options, to know the correct information about their account. And so if there's anyone who actually was at risk of information at their, at their disposal, to deal with that person, answer their questions, figure out whether they really are in default, what their obligation would be to make good, and what their escrow payment would be going forward. So to summarize, your position is while there may be regulations that are not specifically addressed in the standards, you believe that there are standards for which there may already be metrics or that metrics could be developed that would address the issues raised by those regulations? Could have been developed during the three-year period of the term, yes. During that, yes, could have been during that three-year period. That's right. They're sufficiently covered by the standards. We don't think that that's necessary because of the intent that the standards be exclusive. But yes, we think that that's right. And certainly, you know, we've spent now several minutes just on the escrow piece, but I would just encourage the Court to just look at how directly many of the other standards map onto the allegations that the Bureau is making, such as the Bureau says, I don't agree with their characterization of the prior action or this action. They say the prior action is about foreclosures and this action is about the system of records. Well, there's a whole set of standards and a whole set of metrics about this, sorry, there's a whole set of metrics about the system of records. And the standard says that there's going to be an independent person who evaluates whether the system of records is functioning correctly. And I understand the Bureau doesn't think that was adequate, and that's what they complained about in their reply brief, but that's not a reason to let them out of the res judicata impact of the judgment that they negotiated that was entered by the District Court and that represents the complete relief that they are entitled to for the period from 2014 to 2017. The Court has no further questions? Very well. Thank you, Your Honor. Thank you, Mr. Chairman. Mr. DeMille-Wagman, you've got three minutes remaining. Just one more point about the servicing standards and what their purpose was. The servicing standards included the appointment of a monitor and a monitoring committee. What that meant was that the Bureau and all the states had someone right there for three years inside, basically inside Ocwen's operations, watching what Ocwen was doing, getting regular reports. There was this working committee that had to monitor, had to do constant tests. That was very important to the Bureau, to the 49 states, and the District of Columbia. That's something they wouldn't have had under normal circumstances, even under a normal injunctive provision. So yes, the Bureau still retained the authority during that three-year period and subsequent to enforce the law with respect to Ocwen, but hopefully there would have been fewer law violations because there was a monitor there, there was a servicing, there were all monitoring Ocwen's conduct. There still were law violations. The Bureau is pursuing them now and that's just like any other regulatory agency, which may pursue violations of injunctive provisions either through a contempt action or through a new action. It doesn't make any difference that in the consent here, there was an ordered procedure for how contempt actions were to be conducted. Under Norfolk Southern, a court considering the preclusive effect of a consent should look to the specific intent of the parties as expressed in that This sort of goes back to my question earlier about the raging agreement. I don't think that Ocwen like fundamentally disagrees with that premise. I just think it's that you pay attention to the release and they pay attention primarily to the servicing standards and the enforcement mechanism. No, I don't think that's right, Your Honor. We, yes, we pay, well, yes, no. We pay attention to the specific release. We also pay attention to the enforcement mechanism, but they, they misstate what that enforcement mechanism is. They say that the enforcement mechanism applies to activities controlled by the servicing standards. That's not what the enforcement mechanism does. It says that it applies to Ocwen's obligations under the consent. Its obligations under the consent are to comply with the servicing standards. If it fails to do that, the enforcement mechanism kicks in, but that does not cover if Ocwen also violates the law. Again, that's the authority that the Bureau retained with respect to Ocwen going forward in the release. Can I ask you just a quick question about that very last point, and I'm sorry to hold you over, but is this the language that you're talking about in the release? Notwithstanding any other term of this release, the CFPB specifically reserves and does not release any liability dot dot dot. Is that the language where you say you like retain the authority to enforce? Uh, yes, Your Honor. Let me, I just want, because it's paragraph E which says nothing in this release, it's paragraph E of the release, nothing in this release shall limit the Bureau's authority with respect to released parties, Ocwen, except to the extent CFPB has expressly released claims. That's paragraph E. It's quoted, I believe, at page seven or nine of the district court's slip opinion. It's, it's, uh, the final paragraph of the release. Very well. Thank you, Your Honor. We ask you both very, very much. Well argued on both sides. All right, so that case is submitted and we'll move to case number two.